J-S63022-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| STEPHEN CHACA AYRES | |
| Appellant | No. 548 EDA 2015 |

Appeal from the Judgment of Sentence November 12, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0001415-2013

BEFORE:  DONOHUE, J., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.:                    **FILED OCTOBER 27, 2015**

Appellant, Stephen Chaca Ayres, appeals from the November 12, 2014 aggregate judgment of sentence of five to ten years' imprisonment, imposed after he was found guilty of one count each of receiving stolen property, possession of firearms prohibited, firearms not to be carried without a license, possession of an instrument of a crime (PIC), loitering and prowling at night time, and five counts of criminal conspiracy.[1]  After careful review, we affirm.

The trial court summarized the relevant factual and procedural background of this case as follows.

---

[1] 18 Pa.C.S.A. §§ 3925(a), 6105(a)(1), 6106(a)(1), 907(a), 5506, and 903(c), respectively.

At 4:00 a.m. on October 17, 2012, Darby Borough Police Officer Paul McGrenera responded to a radio call of an attempted burglary in progress at 538 Pine Street in Darby. The radio dispatch advised that a blue Buick with tinted windows was possibly involved. When Officer McGrenera arrived at 538 Pine Street he was informed by Mary Ann Bender who lived several doors away at 524 Pine that she saw a blue Buick with tinted windows driving east on Pine Street and turn left onto Fifth Street. The resident of 538 Pine Street, Oliver Sallie, told Officer McGrenera that he was sleeping in his living room when he heard loud banging from the rear door. Sallie went towards the noise and saw a male in a dark hooded sweatshirt on the porch kicking on the back door. Moments later, Sallie saw a blue Buick with heavy tint and a gray panel bottom driving away. The bottom panel on the passenger side was missing from the vehicle. There were footprints on the rear door and fresh damage to the wood frame molding around the door.

Darby Officer John Dupiriak, driving a different police vehicle, also responded to a radio call of a burglary in progress involving a blue Buick with a gray side panel. He was about 10 blocks away from 538 Pine Street when he received the call, and he drove toward the scene with his lights activated but no sirens. The dispatcher advised that the actor was a black male wearing a dark hoody, and that the suspect vehicle was a blue Buick with a gray panel on the side. As Officer Dupiriak turned onto Moore Street, about three blocks away from 538 Pine Street, he observed Co-Defendant Ramey wearing a dark-colored sweatshirt walking towards him. Co-Defendant Ramey turned around and started to run. Officer Dupiriak exited his vehicle and ordered Co-Defendant Ramey to stop. Corporal Treg, who had also arrived on the scene, surrounded Co-Defendant Ramey with guns drawn. Co-Defendant Ramey was forced to the ground and handcuffed. Officer Dupiriak patted Co-Defendant Ramey down for officer safety. Officer Dupiriak removed a bag that was in Co-Defendant Ramey's waistband as well as

latex gloves. The bag was a large plastic trash bag three feet long. Nothing illegal was found inside the bag. There was a clear latex glove on the ground. Officer Dupiriak and Corporal Treg asked Co-Defendant Ramey what he was doing in the area. [He] answered that he was coming from Philadelphia, off of the trolley. The Officers believed this to be an odd story because the trolley had stopped running two hours earlier. Co-Defendant Ramey said he was in the area trying to go to his girlfriend's house to retrieve some items. He could not identify the girlfriend's address or her street. He said that he was doing work with the gloves earlier in the day and had the trash bag to retrieve some items from his girlfriend's house. Co-Defendant Ramey was not sure what location in Philadelphia he was coming from. Officer Dupiriak arrested Co-Defendant Ramey for loitering, took him to police headquarters, and returned to the scene to do more investigating. While Officer Dupiriak was intercepting and arresting Ramey, Officer McGrenera talked with Sallie for about a half hour, and then left Sallie's house in his police vehicle.

About one to two blocks from Sallie's house, Officer McGrenera saw a Buick matching the description of the car that Sallie identified. The car was blue with gray panels missing on the side and had tinted windows, just as Sallie had described. Officer Dupiriak, who had returned after leaving Ramey at the police station, arrived at this location at the same time as Officer McGrenera. Officer Dupiriak observed Officer McGrenera call Delcom dispatch and state that he found a vehicle matching the description of the Buick that had possibly been involved in the burglary attempt.

A male, [Appellant], was sitting in the front passenger seat of the Buick, moving continuously inside the vehicle. Officers McGrenera and Dupiriak approached the car from the rear with guns drawn. Officer McGrenera ordered [Appellant] to exit the vehicle. [Appellant] did not comply. Officer McGrenera smashed the driver side windows to look

inside the vehicle because it was heavily tinted, and as he did so [Appellant] exited on the passenger side. Officer Dupiriak pulled [Appellant] from the vehicle and placed him on the ground. Officer McGrenera saw a silver revolver on the front passenger floor beneath where [Appellant] had been sitting. Officer McGrenera secured the weapon, a [.]38 mm Smith and Wesson. The hand gun was loaded with six bullets. Through the open door, both Officer McGrenera and Officer Dupiriak observed in plain view latex gloves on the passenger side floor and a crowbar on the driver side floor. Corporal Treg ordered the Officers to stop the search and get a warrant, and the car was towed to Enforcement Towing.

Trial Court Opinion, 4/22/15, at 1-5 (internal citations omitted).

On August 12, 2014, Appellant proceeded to a bench trial, at the conclusion of which the trial court found Appellant guilty of one count each of receiving stolen property, possession of firearms prohibited, firearms not to be carried without a license, PIC, loitering and prowling at night time, and five counts of criminal conspiracy. The trial court imposed an aggregate sentence of five to ten years' imprisonment on November 12, 2014.[2] On November 18, 2014, Appellant filed a timely motion for reconsideration of

---

[2] Specifically, the trial court sentenced Appellant to five to ten years for possession of firearms prohibited, 6 to 36 months' for receiving stolen property, 42 to 84 months for firearms not to be carried without a license, 9 to 18 months for PIC, 6 to 12 months for loitering and prowling at night time, and the same sentences for each corresponding criminal conspiracy count. All of these sentences were to run concurrently to each other.

sentence, which the trial court denied on February 3, 2015. On February 24, 2015, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant presents one issue for our review.

> Whether the [trial] court erred when it refused to suppress the fruits of the illegal stop and searches at issue herein, which were conducted without legal justification, and in violation of the rights guaranteed to Appellant by the Fourth and Fourteenth Amendments of the United States Constitution, and Article 1, Section 8 of the Pennsylvania Constitution?

Appellant's Brief at 6.

We begin by noting our well-settled standard of review.

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

**Commonwealth v. Gary**, 91 A.3d 102, 106 (Pa. 2014) (citation omitted). Appellant argues that the police subjected him to an unconstitutional custodial arrest, unsupported by probable cause, or in the alternative an unconstitutional investigative detention, unsupported by reasonable suspicion. Appellant's Brief at 21-22, 26, 32-33. The Commonwealth counters that Appellant was not subjected to a custodial arrest, but an

---

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

investigative detention that was supported by reasonable suspicion. Commonwealth's Brief 24-26.

> The Fourth Amendment of the Federal Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …." U.S. Const. amend. IV. Likewise, Article I, Section 8 of the Pennsylvania Constitution states, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures …." Pa. Const. Art. I, § 8.
>
> *Commonwealth v. Carter*, 105 A.3d 765, 768 (Pa. Super. 2014) (*en banc*), *appeal denied*, 117 A.3d 295 (Pa. 2015).

*Commonwealth v. Williams*, --- A.3d ---, 2015 WL 5810631, at *6 (Pa. Super. 2015). Our cases have recognized three levels of police-citizen interactions.

> The first is a mere encounter, which requires no level of suspicion at all. *Commonwealth v. Daniel*, 999 A.2d 590, 596 (Pa. Super. 2010). The second level is an investigative detention, which must be supported by reasonable suspicion. *Id.* at 596-597. Finally, the third level is an arrest or custodial detention, which must be supported by probable cause. *Id.* at 597.

*Commonwealth v. Walls*, 53 A.3d 889, 892-893 (Pa. Super. 2012). "In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted).

- 6 -

> The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Id.* at 302-303.

In the case *sub judice*, the police encountered Appellant in a vehicle and ordered him out of said vehicle. N.T., 7/17/13, at 25. When he did not comply with their directives, the officers broke through the windows on the other side of the car from where Appellant was sitting.[4] *Id.* at 27. After Officer McGrenera broke the driver's side windows, Appellant opened the front passenger side door and began to exit the vehicle. *Id.* Officer Dupiriak then "pulled [Appellant] from the vehicle and placed him down on the ground." *Id.* The officer then handcuffed him. *Id.* at 71. Based on

---

[4] Officer McGrenera testified that the reason for the breaking of the windows was to be able to see what Appellant was doing inside the passenger compartment of the vehicle for officer safety, as the windows were tinted and Appellant "was still moving inside the vehicle." N.T., 7/17/13, at 26, 27, 52. The Supreme Court has consistently held that an officer may conduct a limited search of the passenger compartment of a car for weapons. ***See generally Michigan v. Long***, 463 U.S. 1032, 1049-1050 (1983). However, Appellant does not raise a challenge to the search of the car on appeal.

these factors, Appellant avers he was subjected to a custodial arrest; whereas the Commonwealth avers the interaction was an investigative detention. Appellant's Brief at 21-22; Commonwealth's Brief 24.

Looking at the circumstances, we initially note that the officers approached the vehicle because they suspected it as being the one utilized by the perpetrators of the robbery at 538 Pine Street. The windows of the Buick were tinted so that the officers could not tell what Appellant was doing inside the vehicle. N.T., 7/17/13, at 24. Due to their inability to see what Appellant was doing, the officers ordered him out of the vehicle. ***Id.*** It is axiomatic that the police may order a driver or passenger out of a vehicle as part of an investigative detention. ***See generally Maryland v. Wilson***, 519 U.S. 408, 414 (1997); ***Pennsylvania v. Mimms***, 434 U.S. 106, 110 (1977) (*per curiam*).

Appellant further argues that the officers' use of handcuffs, immediately after Appellant's non-cooperation with their instruction to step out of the Buick, supports a finding of a custodial arrest. Appellant's Brief at 23. Our cases have held that, under Pennsylvania law, "the handcuffing of [a defendant is] merely part and parcel of ensuring the safe detaining of the individuals during the lawful ***Terry***[5] stop." ***Commonwealth v. Guillespie***, 745 A.2d 654, 660-661 (Pa. Super. 2000). Our Supreme Court has held

---

[5] ***Terry v. Ohio***, 392 U.S. 1 (1968).

that a defendant is only subject to an investigative detention, even if the police handcuffed him and placed him in the back of a police car. **Commonwealth v. Gwynn**, 723 A.2d 143, 149 (Pa. 1998), *cert. denied*, **Gwynn v. Pennsylvania**, 528 U.S. 969 (1999). Further, this Court has stated that a custodial arrest does not arise until a defendant is not only handcuffed, but also transported by the police to jail. **Commonwealth v. Charleston**, 16 A.3d 505, 515 (Pa. Super. 2011), *appeal denied*, 30 A.3d 486 (Pa. 2011); **see also Commonwealth v. Rosas**, 875 A.2d 341, 348 (Pa. Super. 2005) (stating that the fact that police "ordered Rosas out of the car and placed him in handcuffs … [did] not support the conclusion that Rosas was under arrest[]"), *appeal denied*, 897 A.2d 455 (Pa. 2005). Based on these considerations, we conclude Appellant was subjected to an investigative detention and not a custodial arrest. Therefore, the officers' needed reasonable suspicion that criminal activity was afoot to effectuate a constitutional seizure of Appellant.

> It is axiomatic that to establish reasonable suspicion, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." **United States v. Sokolow**, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted). … A suppression court is required to "take[] into account the totality of the circumstances—the whole picture." **Navarette**, *supra* (internal quotation marks and citation omitted). When conducting a **Terry** analysis, it is incumbent on the suppression court to inquire, based on all of the circumstances known to the officer *ex*

> *ante*, whether an objective basis for the seizure was present. ***Adams v. Williams***, 407 U.S. 143, 146 (1972).

> ***Carter***, *supra* at 768-769.

***Williams***, *supra*.

In this case, the officers were called to 538 Pine Street in response to a burglary. N.T., 7/17/13, at 9-10. The initial radio dispatch, a neighbor eyewitness, and the victim of the robbery all told the officers that a blue Buick, specifically with a grey side panel, was involved in the burglary. ***Id.*** at 10, 14, 17-18. Approximately one to two blocks away from the site of the burglary, the officers saw a blue Buick with grey side panels with tinted windows, as had been described to them from multiple sources. ***Id.*** at 23. In our view, the vehicle's close proximity to the site of the burglary, as well as the fact that it matched exactly the description given to the police from multiple sources, provided the officers with the reasonable suspicion that the person occupying it may have been involved in the robbery. "We stress that the Fourth Amendment did not require that [the officers] be correct or even certain in [their] suspicion." ***Williams***, ***supra*** at *7, *citing* ***Navarette v. California***, 134 S. Ct. 1683, 1687 (2014); ***see also Walls***, ***supra*** at 894 (concluding that the officers had reasonable suspicion that suspect was involved in criminal activity in part because of his "proximity to the location described in the flash, and [his] matching the description of the suspect[]"). Based on these considerations, we conclude that Appellant's Fourth

Amendment rights were not violated by the seizure in this case. Therefore, as Appellant only argues that the items obtained from the vehicle were tainted by his initial encounter with the police, the trial court did not err in denying his motion to suppress the same as the "fruit of his unlawful arrest." Appellant's Brief at 36.[6]

Based on the foregoing, we conclude Appellant's arguments on appeal are devoid of merit. Accordingly, the trial court's November 12, 2014 judgment of sentence is affirmed.

Judgment of sentence affirmed.

Judge Musmanno joins the memorandum.

Judge Donohue concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/27/2015</u>

_____

[6] Although the Commonwealth has argued in its brief that the search of the car was constitutional under the plain view doctrine, as noted above, Appellant does not challenge the search of the car outside the parameters described above. Therefore, we do not express an opinion on this question. In addition, in light of our resolution of Appellant's issues in the Commonwealth's favor, we need not consider the Commonwealth's alternative argument that Appellant lacked a reasonable expectation of privacy in the Buick.